IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEGAL AID SERVICES OF OREGON,
ARRON GUEVARA, JANICE MORGAN,
SHARON LEE SCHWARTZ, DONNA
SATHER, OREGON LAW CENTER, DAVID
HENRETTY, DIANE SCHWARTZ SYKES,
LOREY FREEMAN, COMMUNITY
ALLIANCE OF TENANTS, and CAMPAIGN
FOR EQUAL JUSTICE,

                Plaintiffs,

                                        CV 05-1444-PK
v.

                                        OPINION AND
                                        ORDER

LEGAL SERVICES CORPORATION,

                Defendant.

————————————————————

PAPAK, Magistrate Judge:

      On September 16, 2005, plaintiffs Legal Aid Services of Oregon ("LASO"), Oregon Law

Center ("OLC"), Community Alliance of Tenants ("CAT"), Campaign for Equal Justice ("CEJ"),

LASO employees Arron Guevara, Janice Morgan, and Sharon Lee Schwartz (collectively, the

"LASO employees" and, collectively with LASO, the "LASO plaintiffs"), OLC employees

David Henretty, Diane Schwartz Sykes and Lorey Freeman (collectively, the "OLC employees"),

and LASO and OLC board member Donna Sather (collectively with LASO, OLC, CAT, CEJ, the LASO employees, and the OLC employees, the "nongovernmental plaintiffs"), filed this action against defendant Legal Services Corporation ("LSC") under 28 U.S.C. § 2201, alleging that certain restrictions placed on their activities by the Omnibus Consolidated Rescissions and Appropriations Act ("OCRAA") of 1996, Pub. L. No. 104-134, § 504, 110 Stat. 1321 (1996), reenacted in the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, § 502, 110 Stat. 3009 (1997), and the implementing regulations promulgated thereunder by LSC, 45 C.F.R. § 1600 *et seq.*, were unconstitutional both facially and as applied under the First and Fifth Amendments to the U.S. Constitution. The State of Oregon filed a separate action against LSC alleging that one of the implementing regulations, 45 C.F.R. § 1610.8 (the "Program Integrity Rule" or "PIR"), both impermissibly infringed on its sovereignty in violation of the Tenth Amendment and exceeded federal authority under the Spending Clause of the United States Constitution. Upon unopposed motion, the two actions were consolidated effective November 7, 2005. In addition, the U.S. Department of Justice's unopposed motion to intervene in the consolidated action was granted effective January 10, 2006.

On July 10, 2006, this court issued Findings and Recommendations recommending that all claims be dismissed other than the nongovernmental plaintiffs' as-applied challenge, as to which the court granted plaintiffs' oral motion requesting additional relevant discovery pursuant to Federal Civil Procedure Rule 56(f). On October 20, 2006, Judge Jones adopted this court's recommendation without modification.[1]

---

[1] Subsequently, on October 10, 2007, all parties consented to jurisdiction by a United States Magistrate Judge.

Now before the court are the United States' motion for summary judgment (#106), LSC's motion for summary judgment (#109), the LASO plaintiffs' motion for partial summary judgment as to the as-applied unconstitutionality of the PIR and substantive restrictions (#115), and the LASO plaintiffs' motion to strike the declaration of Mark Freedman in support of LSC's motion for summary judgment (#147). This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). For all of the reasons that follow, the LASO plaintiffs' motion to strike and motion for partial summary judgment are each denied, and the United States' and LSC's motions for summary judgment are each granted.

## LEGAL STANDARDS

### I. Motion to Strike

The disposition of a motion to strike is within the discretion of the district court. *See Federal Sav. & Loan Ins. Corp. v. Gemini Management*, 921 F.2d 241, 244 (9th Cir. 1990). Motions to strike are disfavored and infrequently granted. *See Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wind Distribs. Pty., Ltd.*, 647 F.2d 200, 201, 201 n.1 (D.C. Cir. 1981); *Pease & Curren Refining, Inc. v. Spectrolab, Inc.*, 744 F. Supp. 945, 947 (C.D. Cal. 1990), abrogated on other grounds by *Stanton Road Ass'n v. Lohrey Enters.*, 984 F.2d 1015 (9th Cir. 1993).

### II. Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND

### I.     The Parties

Defendant Legal Services Corporation is a non-profit government-funded corporation created by Congress "for the purpose of providing financial support for legal assistance in noncriminal proceedings or matters to persons financially unable to afford legal assistance." 42 U.S.C. § 2996b(a)[2]. The business of LSC is to make and administer grants to qualified civil

---

[2] In creating the LSC, Congress declared that:

(1)     there is a need to provide equal access to the system of justice in our Nation for individuals who seek redress of grievances;

(2)     there is a need to provide high quality legal assistance to those who would be otherwise unable to afford adequate legal counsel and to continue the present vital legal services program;

(3)     providing legal assistance to those who face an economic barrier to adequate legal counsel will serve best the ends of justice and assist in improving opportunities for low-income persons consistent with the purposes of this chapter;

(4)     for many of our citizens, the availability of legal services has reaffirmed faith in our government of laws;

(5)     to preserve its strength, the legal services program must be kept free from the influence of or use by it of political pressures; and

legal services programs in each state of the nation. LSC grantee organizations use these federal

funds to provide free legal services to indigent clients.

The United States Department of Justice has intervened in this matter to defend the

challenged statutes and implementing regulations.

Plaintiff Legal Aid Services of Oregon is a nonprofit LSC grantee organization that

provides civil legal services to low-income clients in Oregon. LASO operates out of

approximately ten regional offices located throughout the state of Oregon, and serves over

50,000 clients per year (a number estimated to be under 18 percent of eligible Oregonians who

need legal aid). LASO receives approximately 45 percent of its funding from the LSC. LASO

brings this action in its own right and on behalf of its lawyer employees, including those who are

not named parties to this action.

Named plaintiffs and LASO employees Arron Guevara, Janice Morgan, and Sharon Lee

Schwartz bring this action in their own right as lawyer employees of LASO and also on behalf of

the legal services clients with whom they share a confidential relationship. Plaintiff Guevara is

the regional director of LASO's Pendleton office, plaintiff Morgan is the director of the LASO

Farm Workers Program, which provides legal services to agricultural employees throughout the

State of Oregon, and plaintiff Schwartz is the regional director of LASO's Roseburg office,

which is responsible for providing legal services to Douglas County.

---

(6)     attorneys providing legal assistance must have full freedom to protect the
        best interests of their clients in keeping with the Code of Professional
        Responsibility, the Canons of Ethics, and the high standards of the legal
        profession.

42 U.S.C. § 2996.

The Oregon Law Center is a nonprofit corporation established in 1995 as an affiliate of LASO. Like LASO, the OLC provides civil legal services to low-income clients in Oregon; unlike LASO, the OLC does not receive funding from the LSC, but rather relies on funding from other sources. Because the OLC does not receive funding from the LSC, it is not subject to the OCRAA restrictions, the as-applied constitutionality of which is the subject of this lawsuit. The OLC has six offices that are "paired" with LASO offices to coordinate the two organizations' delivery of services.

Named plaintiffs and OLC employees David Henretty, Diane Schwartz Sykes and Lorey Freeman, like the LASO employee plaintiffs, bring this action in their own right and on behalf of their clients with whom they share a confidential relationship. Plaintiff Henretty is the managing attorney of the OLC's Ontario office, plaintiff Sykes represents immigration, housing, and domestic violence clients in ten Oregon counties covering a combined area in excess of 10,000 square miles, and plaintiff Freeman is an attorney in the OLC's Portland office.

Plaintiff Donna Sather sits on the boards of directors of both LASO and the OLC, in both cases as a client representative.

Plaintiff Community Alliance of Tenants is a grassroots, tenant-membership organization that conducts housing rights education, and works on issues related to housing policy by administrative and legislative lobbying. CAT also manages a rental rights hotline that is staffed by volunteers. CAT has a high percentage of members who are low-income and regularly refers its members to LASO and OLC.

Plaintiff Campaign for Equal Justice is a private, nonprofit corporation that was formed by attorneys in 1991 to fund programs that provide civil legal services to poor Oregonians and to

improve access to the civil justice system.  CEJ has raised millions of dollars, primarily from individual Oregon attorneys and law firms, and in the past donated most of its funds to LASO. Since enactment of the OCRAA, CEJ has split its donations between LASO and OLC.

## II.      The 1996 Restrictions and the Interrelated Organizations Rule

From the inception of the LSC grant program, grantees have been subject to restrictions on their use of LSC funds.  *See* 42 U.S.C. § 2996f(b)(1)-(10).  These restrictions were substantially expanded in 1996, when Congress responded to criticisms of the LSC program by enacting the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 504, 110 Stat. 1321, 1321-53-56 (1996).  The 1996 restrictions barred any entity from receiving LSC funds if the entity was involved in a wide array of activities including, in relevant part, lobbying state and local governmental bodies, participating in class action litigation, filing petitions for or otherwise receiving court-ordered attorney fees, or soliciting clients:

> None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any person or entity . . . –
>
> * * *
>
> (2) that attempts to influence the issuance, amendment, or revocation of any executive order, regulation, or other statement of general applicability and future effect by any Federal, State, or local agency;
>
> (3) that attempts to influence any part of any adjudicatory proceeding of any Federal, State, or local agency if such part of the proceeding is designed for the formulation or modification of any agency policy of general applicability and future effect;
>
> (4) that attempts to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative, or any similar procedure of the Congress or a State or local legislative body [(collectively with subsections (2) and (3), the "Lobbying Restriction")];
>
> * * *

(7) that initiates or participates in a class action suit; [(the "Class Action Restriction")];

* * *

(13) that claims (or whose employee claims), or collects and retains, attorneys' fees pursuant to any Federal or State law permitting or requiring the awarding of such fees [(the "Attorney Fee Restriction")];

* * *

(18) unless such person or entity agrees that the person or entity, and the employees of the person or entity, will not accept employment resulting from in-person unsolicited advice to a nonattorney that such nonattorney should obtain counsel or take legal action, and will not refer such nonattorney to another person or entity or an employee of the person or entity, that is receiving financial assistance provided by the Corporation [(the "Solicitation Restriction").]

OCRAA § 504(a). Section 504(a) imposed additional restrictions on grantee organizations that are not challenged herein, including restrictions on involvement in political redistricting, OCRAA § 504(a)(1), representation of certain aliens, OCRAA § 504(a)(11), providing training in collective political action or protest, OCRAA § 504(a)(12), conducting litigation in connection with abortion rights, OCRAA § 504(a)(14), representing incarcerated clients, OCRAA § 504(a)(15), challenging the validity of laws relating to the provision of welfare benefits, OCRAA § 504(a)(16), and representing a public housing tenant in connection with eviction proceedings if the tenant has been involved with drug crime, OCRAA § 504(a)(17).

Shortly after OCRAA was enacted, LSC promulgated a regulation sometimes referred to as the "interrelated organizations rule," which among other things effectively prohibited LSC grantees from maintaining non-grantee affiliate organizations with the right to engage in activities subject to the 1996 restrictions. *See* 61 FR 63749, 63752 ("for transfers of LSC funds, the [restrictions] will apply to both the LSC funds and the non-LSC funds of the entity receiving

those funds . . . ; [w]hen a recipient transfers its non-LSC funds to an entity that has no LSC funds, the conditions remain attached to the transferred funds . . .").

### III.     Unconstitutional Conditions Jurisprudence as of 1996

At the time the 1996 restrictions and interrelated organizations rule were enacted, five United States Supreme Court decisions served as guideposts to navigating the unconstitutional conditions  analysis:  *Perry v. Sindermann*, 408 U.S. 593 (1972), *Regan v. Taxation with Representation of Washington* [("*TWR*")], 461 U.S. 540 (1983), *Federal Communications Commission v. League of Women Voters of California* [("*League*")], 468 U.S. 364 (1984), *Rust v. Sullivan*, 500 U.S. 173 (1991), and *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995).  Because these cases provide the rules of law that resulted in LSC's withdrawal of the interrelated organizations rule and promulgation of the Program Integrity Rule in its current form, it is worth examining them in detail here.

In 1972, the Supreme Court of the United States wrote that:

> For at least a quarter-century, this Court has made clear that even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely.  It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.  This would allow the government to produce a result which it could not command directly.  . . .  Such interference with constitutional rights is impermissible.

*Perry*, 408 U.S. at 597 (citation, internal quotation marks and modification omitted).

Eleven years later, in *TWR*, 461 U.S. 540, the court found that Congress could restrict 501(c)(3) status to organizations which do not engage in substantial lobbying activities,

reasoning that c(3) organizations could exercise their otherwise restricted free speech rights by separately incorporating affiliate 501(c)(4) organizations and directing their c(4) affiliates to express their opinions through lobbying, so long as such c(3) organizations did not directly subsidize their sister c(4) organizations. *See TWR*, 461 U.S. at 544. The court stated that:

> The IRS apparently requires only that the two groups be separately incorporated and keep records adequate to show that tax-deductible contributions are not used to pay for lobbying. This is not unduly burdensome.

*Id.* at 544, n. 6.

Noting that "[g]enerally, statutory classifications are valid if they bear a rational relation to a legitimate governmental purpose," *id.* at 547, and that "[s]tatutes are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech. . . ," *id.*, the court concluded that the "rational relation" standard was applicable to the statutory classifications at issue, because there was no indication that Congress had been aiming "at the suppression of dangerous ideas" in enacting the classifications, *id.* at 548. Analyzing the statutory scheme under that standard, the court found that it was not irrational for Congress to decide against subsidizing the lobbying activities of 501(c)(3) organizations, or in favor of subsidizing the lobbying activities of veterans' organizations while denying such subsidies to other sorts of charitable organizations.

Critical to the court's decision to apply the rational relation standard rather than strict scrutiny was the holding that the statutory classification scheme did not burden or otherwise infringe upon any first amendment or equal protection right. *See id.* at 546 ("Congress has not infringed any First Amendment rights or regulated any First Amendment activity [but rather] has simply chosen not to pay for TWR's lobbying"). Although favorable tax advantages were

conferred on one group, no penalty was imposed on groups not so favored, and the classification

operated without regard to the content of the lobbying activities engaged in or proposed by any

of the impacted groups.

The following year, the court decided *League*, 468 U.S. 364, in which the court struck

down as unconstitutional a statutory provision that prohibited noncommercial radio station

recipients of grants from the Public Broadcasting Corporation from airing editorials, whatever

their content.  In determining what standard of review to apply, the *League* court made clear that,

because the first amendment rights of the grantee radio stations were squarely at issue, under

normal circumstances strict scrutiny would be applied.  *See League*, 468 U.S. at 374-375.

However, the court held that, because only a limited number of broadcasting licenses were

available, due to the finite range of wavelengths that may feasibly be utilized for broadcasting

purposes, a different level of scrutiny was appropriate here:  restrictions on the first amendment

rights of broadcasters would be upheld so long as they were narrowly tailored to further a

substantial government interest.  *See id.* at 380.  Under that intermediate level of scrutiny, having

found that "the manifest imprecision of the ban . . . reveals that its proscription is not sufficiently

tailored to the harms it seeks to prevent to justify its substantial interference with broadcasters'

speech," *id.* at 392, and that "it seems doubtful that [the ban] can fairly be said to advance any

genuinely substantial governmental interest," *id.* at 396, the court concluded that:

> the specific interests sought to be advanced by [the] ban on editorializing are
> either not sufficiently substantial or are not served in a sufficiently limited manner
> to justify the substantial abridgment of important journalistic freedoms which the
> First Amendment jealously protects.

*Id.* at 402.

The court expressly rejected the argument that the government could justify the ban on

the basis of Congressional spending power, distinguishing the court's recent decision in *TWR* on

the grounds that the ban on editorializing did not permit an affected broadcaster "to segregate its

activities according to the source of its funding." *Id.* at 400. That is, the ban acted as a complete

bar to editorializing activity, regardless of whether federal funds were segregated from projects

involving editorial opinions. *See id.* In this connection, the court opined that:

> Of course, if Congress were to adopt a revised version of [the statutory provision]
> that permitted noncommercial educational broadcasting stations to establish
> "affiliate" organizations which could then use the station's facilities to editorialize
> with nonfederal funds, such a statutory mechanism would plainly be valid under
> the reasoning of [*TWR*]. Under such a statute, public broadcasting stations would
> be free, in the same way that the charitable organization in [*TWR*] was free, to
> make known its views on matters of public importance through its nonfederally
> funded, editorializing affiliate without losing federal grants for its
> noneditorializing broadcast activities.

*See id.*

In 1991, the court returned to these issues in *Rust*, 500 U.S. 173. At issue in *Rust* was the

facial constitutionality of restrictions on family-planning program recipients of federal funds

preventing them from counseling, referral, and distribution of information regarding abortion.

The restrictions required grantees to maintain strict physical and financial separation between

their unrestricted programs and any restricted abortion-related activities they might also be

engaged in. The *Rust* court made clear, preliminarily, that:

> The Government can, without violating the Constitution, selectively fund a
> program to encourage certain activities it believes to be in the public interest,
> without at the same time funding an alternative program which seeks to deal with
> the problem in another way. In so doing, the Government has not discriminated
> on the basis of viewpoint; it has merely chosen to fund one activity to the
> exclusion of the other.

*Rust*, 500 U.S. at 193. The court distinguished *Perry*, *supra*, on the ground that by enacting the

family planning restrictions "the Government [wa]s not denying a benefit to anyone, but [wa]s

instead simply insisting that public funds be spent for the purposes for which they were authorized." *Rust*, 500 U.S. at 196. The court noted that the "regulations do not force the . . . grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from [government-sponsored family planning] activities." *Id.*

"In contrast," the court reasoned, "our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." *Id.* at 197 (emphasis original). The family-planning restrictions did not deny family-planning programs the right to engage in the restricted activities; rather, the government "merely refused to fund such activities out of the public fisc, and the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program." *Id.* at 198.

The *Rust* court specifically addressed the potential abridgement of the free speech rights of persons employed by recipient family-planning programs, holding that their rights were not unconstitutionally impaired since they remained free to engage in abortion-related counseling and information distribution whenever acting outside the scope of their employment. *See id.* at 198-199. The court conceded that "[t]he employees' freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project. . . ." *Id.* at 199.

In 1995, the court reiterated its prohibition against viewpoint discrimination in *Rosenberger*, 515 U.S. 819. At issue in *Rosenberger* were guidelines promulgated by the

University of Virginia (an instrumentality of the State of Virginia) which authorized the use of

student activity fees to pay third-party costs incurred by student groups with "Contracted

Independent Organization" status, including printing costs incurred by student newspapers, but

excluded from such authorization costs incurred in connection with religious activity, including

printing costs incurred by a student newspaper expressly founded to promote an evangelizing

Christian viewpoint.  The court began its discussion by citing the principles that form the

framework of the viewpoint discrimination analysis:

> **It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.**  *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 96, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972).  Other principles follow from this precept.  In the realm of private speech or expression, government regulation may not favor one speaker over another.  *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804, 80 L. Ed. 2d 772, 104 S. Ct. 2118 (1984).  **Discrimination against speech because of its message is presumed to be unconstitutional.**  *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641-643, 129 L. Ed. 2d 497, 114 S. Ct. 2445 (1994).  These rules informed our determination that the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression.  *Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd.*, 502 U.S. 105, 116 L. Ed. 2d 476, 112 S. Ct. 501, 115 (1991).  When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.  *See R. A. V. v. St. Paul*, 505 U.S. 377, 391, 120 L. Ed. 2d 305, 112 S. Ct. 2538 (1992).   Viewpoint discrimination is thus an egregious form of content discrimination.   **The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.**  *See Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 46, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983).

*Rosenberger*, 515 U.S. at 828-829 (emphasis supplied).

The court held that the prohibition against use of student activity fees to pay printing

costs incurred in producing a Christian newspaper did not constitute a content-based limitation

on free speech rights, in that it did not exclude religion as a subject matter, but rather "select[ed]

for disfavored treatment those student journalistic efforts with religious editorial viewpoints."
*Id.* at 831. The court was unpersuaded, however, by the argument that the limitation was not
viewpoint based in that it excluded all expressly religious perspectives, including expressly
atheist perspectives, stating that "[i]t is as objectionable to exclude both a theistic and an
atheistic perspective on the debate as it is to exclude one, the other, or yet another political,
economic, or social viewpoint." *Id.*

The court further found that the free speech principles forbidding viewpoint
discrimination were not in conflict with establishment clause principles prohibiting the use of
public funds to subsidize proselytizing activity, because the use of student activity fees to pay
third party costs of qualified student organizations was facially neutral with respect to religion.
*See id.* at 845-846.

## IV.     Promulgation of the Program Integrity Rule

In *Legal Aid Soc'y of Hawaii v. Legal Servs. Corp.* [("*LASH I*")], 961 F. Supp. 1402 (D.
Haw. 1997), the court for the District of Hawaii found that, under the interrelated organizations
rule, plaintiffs' First Amendment rights of freedom of speech and association were impaired by
some of the 1996 restrictions. The court based its holding on *Perry*, 408 U.S. 593, *TWR*, 461
U.S. 540, *League*, 468 U.S. 364, and, above all, *Rust*, 500 U.S. 173.

The *LASH I* court concluded from its analysis of these cases that the dispositive factor
common to each was whether the restriction left open "adequate channels for speech." *LASH I,*
961 F. Supp. at 1414. The court held that in combination with the interrelated organizations
rule, the restrictions effectively prevented LSC grantees from engaging in protected acts of free
speech, and on that basis granted an injunction enjoining LSC from enforcing the restrictions

against the plaintiffs.

LSC  responded to the *LASH I* injunction by adopting an interim program integrity

regulation (62 FR 12101) modeled after the restrictions that passed constitutional muster in *Rust*.

The interim rule was later modified and adopted in its current form as 45 C.F.R. § 1610.8.  The

current Program Integrity Rule provides, in relevant part, as follows:

> A recipient must have objective integrity and independence from any organization
> that engages in restricted activities.  A recipient will be found to have objective
> integrity and independence from such an organization if:
>
> (1)     The other organization is a legally separate entity;
>
> (2)     The other organization receives no transfer of LSC funds, and LSC
>         funds do not subsidize restricted activities; and
>
> (3)     The recipient is physically and financially separate from the other
>         organization. Mere bookkeeping separation of LSC funds from
>         other funds is not sufficient. Whether sufficient physical and
>         financial separation exists will be determined on a case-by-case
>         basis and will be based on the totality of the facts. The presence or
>         absence of any one or more factors will not be determinative.
>         Factors relevant to this determination shall include but will not be
>         limited to:
>
>         (i)     The existence of separate personnel;
>
>         (ii)    The existence of separate accounting and timekeeping
>                 records;
>
>         (iii)   The degree of separation from facilities in which restricted
>                 activities occur, and the extent of such restricted activities;
>                 and
>
>         (iv)    The extent to which signs and other forms of identification
>                 which distinguish the recipient from the organization are
>                 present.

45 C.F.R. 1610.8(a).  The LSC offers the following as "guidance" regarding the separate

personnel requirement of the Program Integrity Rule:

There is no per se bar against a recipient employing part-time staff who are also employed part-time by an organization which engages in restricted activity. Generally speaking, however, the more staff "shared," or the greater the responsibilities of the staff who are employed by both organizations, the more danger that program integrity will be compromised. Sharing an executive director, for example, inappropriately tends to blur the organizational lines between the entities. Likewise, sharing a substantial number or proportion of recipient staff calls the recipient's separateness into question.

      a.     **Arrangements to share personnel.** The governing body should review whether the recipient has any arrangements to employ any of the same personnel with other organizations which engage in restricted activity. If such arrangements exist, the governing body should review the number and positions of recipient staff who are "shared," and the duties they perform as recipient employees.

      b.     **Joint utilization of personnel and facilities.** Even where there is no agreement to jointly employ the same staff, if the recipient and an organization which engages in restricted activity are using any of the same facilities or equipment, the governing body should review the number, positions and duties of part-time staff who are also working part-time with the other organization.

      c.     **Substantial proportion of attorney or paralegal staff.** The governing body should be similarly informed if a substantial proportion of the recipient's attorney and/or paralegal staff work part-time for an organization which engages in restricted activity regardless of whether or not there is an agreement to share staff or the two organizations share facilities or equipment.

      d.     **No restricted work while on duty.** The governing body should also ensure that the recipient has systems in place to assure that no staff perform any restricted work while on duty for the recipient nor identify the recipient with restricted activity. Attorneys or paralegals must maintain time records pursuant to the timekeeping requirements of 45 CFR 1635. Accurate timekeeping of activity undertaken for the recipient will be especially important for any recipient attorneys or paralegals who work part-time for an organization which engages in restricted activity.

LSC Publication: Guidance in Applying the Program Integrity Standards (footnotes omitted)[3].

---

[3] A footnote to paragraph c of the cited guidance states that: "For larger organizations, 10% of the recipients's attorney/paralegal staff should serve as a guide. However, for recipients

## V.    Prior Constitutional Challenges to the 1996 Restrictions and the Program Integrity Rule

The District of Hawaii responded to the replacement of the interrelated organizations rule with the Program Integrity Rule by dissolving its injunction and granting summary judgment in favor of the LSC, in *Legal Aid Soc'y of Hawaii v. Legal Servs. Corp.* [("*LASH II*")], 981 F. Supp. 1288 (D. Haw. 1997). The *LASH II* court interpreted the new regulation as allowing a program that receives LSC funds "to control another organization that engages in restricted activities, so long as the insularity and separate incorporation requirements of the regulations are satisfied." *Id.* at 1290. The court noted that although the Program Integrity Rule required separate incorporation of the affiliate organization, which was more than was required in *Rust*, this constituted no more than a *de minimis* requirement. *Id.* The *LASH II* court held that adequate alternative channels exist for an LSC-funded program to engage in protected speech because such organizations may exercise control over an affiliate organization under the Program Integrity Rule. *See id.* at 1298.

On appeal, the Ninth Circuit affirmed that the 1996 restrictions, taken together with the Program Integrity Rule, were facially constitutional. *See Legal Aid Soc'y of Hawaii v. Legal Servs. Corp.* [("*LASH III*")], 145 F.3d 1017 (9th Cir. 1998). The court expressly found that the Supreme Court's decision in *Rust* controlled the necessary analysis, and affirmed the district court's decision on that basis. With respect to the First Amendment rights of individual lawyers employed by the plaintiffs, the Ninth Circuit held that an adequate alternative channel existed for

with smaller staffs, the program director should use his or her best judgement to determine whether part-time staff constitute a substantial proportion of the recipient's legal workforce." LSC Publication: Guidance in Applying the Program Integrity Standards.

engaging in protected speech in that:

> If an attorney wishes to engage in prohibited activities, the attorney could work part-time at an unrestricted organization in certain circumstances or engage on his own time in restricted activities that do not involve the outside practice of law, such as lobbying.

*LASH III*, 145 F.3d at 1029.  However, the *LASH III* court expressly left open the possibility that the regulations might be challenged on an as-applied basis.

Following LSC's promulgation of the Program Integrity Rule, and shortly before the *LASH III* opinion issued, the constitutionality of the 1996 restrictions and PIR were addressed by the district court for the Eastern District of New York in *Velazquez v. Legal Servs. Corp.* [("*Velazquez I*")], 985 F. Supp. 323 (E.D.N.Y. 1997).  The *Velazquez I* court refused to grant a preliminary injunction enjoining LSC from enforcing certain of the 1996 restrictions, finding the Program Integrity Rule facially constitutional.  In *Velazquez v. Legal Servs. Corp.* [("*Velazquez II*")]*,* 164 F.3d 757 (2nd Cir. 1999) the Second Circuit affirmed the district court's ruling with respect to most of the facial challenges, holding that "Congress may burden the First Amendment rights of recipients of government benefits if the recipients are left with adequate alternative channels for protected expression." *Velazquez II*, 164 F.3d at 766.  The court reversed, however, with respect to a restriction preventing grantees from challenging the validity of any welfare law.  The *Velazquez II* court found the welfare restriction was viewpoint-based discrimination subject to strict First Amendment scrutiny, and directed the district court below to enter a preliminary injunction enjoining LSC from enforcing the welfare restriction.  *Id.* at 772.  Both parties appealed, and the Supreme Court granted *certiorari* to LSC as to the constitutionality of the welfare restriction only.

In *Legal Servs. Corp. v. Velazquez* [("*Velazquez III*")], 531 U.S. 533 (2001), in an

opinion drafted by Justice Kennedy, the Supreme Court agreed with the *Velazquez II* court and held that the welfare restriction violated the First Amendment. The court rejected the argument that, as in *Rust*, the speech at issue here was government speech, and instead held that, as in *Rosenberger*, "the LSC program was designed to facilitate private speech, not to promote a governmental message." *Velazquez III*, 431 U.S. at 542. On this basis, the *Velazquez III* court expressly distinguished *Rust*, characterizing the *Rust* decision as standing for the proposition that viewpoint-based funding decisions are entitled to greater latitude when the government itself is the speaker. *See id.* at 541-542.

The *Velazquez III* court further reasoned that the restriction, described as "sift[ing] out cases presenting constitutional challenges in order to insulate the Government's laws from judicial inquiry," *id.* at 546, would have the effect of distorting the proper functioning of the legal system:

> Restricting LSC attorneys in advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys in much the same way broadcast systems or student publication networks were changed in the limited forum cases we have cited. Just as government in those cases could not elect to use a broadcasting network or a college publication structure in a regime which prohibits speech necessary to the proper functioning of those systems, . . . it may not design a subsidy to effect this serious and fundamental restriction on advocacy of attorneys and the functioning of the judiciary.

*Velazquez III*, 531 U.S. at 544 (citations omitted). The court continued:

> An informed, independent judiciary presumes an informed, independent bar. Under § 504(a)(16), however, cases would be presented by LSC attorneys who could not advise the courts of serious questions of statutory validity. The disability is inconsistent with the proposition that attorneys should present all the reasonable and well-grounded arguments necessary for proper resolution of the case. By seeking to prohibit the analysis of certain legal issues and to truncate presentation to the courts, the enactment under review prohibits speech and expression upon which courts must depend for the proper exercise of the judicial

power.

*Id.* at 545.

The court concluded that so to prevent LSC grantee attorneys from making use of all arguments available to them would impermissibly create "two tiers of cases," and that in those where an LSC grantee attorney was counsel of record, "there would be lingering doubt whether the truncated representation had resulted in complete analysis of the case, full advice to the client, and proper presentation to the court." *Id.* at 547.

In addition, the court expressly addressed in the negative the question whether an attorney's right to withdraw from representation of a client could create an adequate alternative channel for the protected speech:

> It is no answer to say the restriction on speech is harmless because, under LSC's interpretation of the Act, its attorneys can withdraw. This misses the point. The statute is an attempt to draw lines around the LSC program to exclude from litigation those arguments and theories Congress finds unacceptable but which by their nature are within the province of the courts to consider.
>
> . . . Thus, with respect to the litigation services Congress has funded, there is no alternative channel for expression of the advocacy Congress seeks to restrict. This is in stark contrast to *Rust*.

*Id.* at 546-547.

The court concluded, in light of these concerns, that Congress lacked authority to impair the free speech rights of LSC grantee lawyers to advance arguments in litigation that would be available to other attorneys, even for the purpose of guaranteeing the integrity of the LSC program. *See id.* at 547-548.

In a dissenting opinion joined by Justices Rehnquist, O'Connor, and Thomas, Justice Scalia argued that the 1996 Restrictions and Program Integrity Rule were not meaningfully

distinguishable from the analogous restrictions at issue in *Rust*, and that under *Rust* there was

"no legitimate basis" for declaring the welfare restriction unconstitutional.

Following the Supreme Court's decision in *Velazquez III*, the *Velazquez* plaintiffs filed

new preliminary injunction applications raising, *inter alia*, facial and as-applied First

Amendment challenges to the constitutionality of the 1996 restrictions and Program Integrity

Rule.  In *Velazquez v. Legal Servs. Corp.* [("*Velazquez IV*")], 349 F. Supp. 2d 566 (E.D.N.Y.

2004), applying a traditional viewpoint analysis rather than the distortion analysis used by the

Supreme Court in *Velazquez III*, the district court for the Eastern District of New York found the

Class Action Restriction, the Attorney Fee Restriction, and the Solicitation Restriction viewpoint

neutral and reasonable.  *Velazquez IV*, 349 F. Supp. 2d. at 595-598.  Based on that finding, the

court held that the challenged restrictions were facially constitutional under the First

Amendment.  *Id.*

The *Velazquez IV* court analyzed the as-applied challenge to the Program Integrity Rule

using an "undue burden" test.[4]   Under this test, the court found that the administrative burdens

created by the Program Integrity Rule outweighed the government's interest in preventing the

appearance of government endorsement of restricted activities and preventing indirect

subsidization of restricted activities, and on that basis granted the plaintiffs' request for an

injunction enjoining LSC from enforcing the PIR.  *See id.* at 610-613.  All parties appealed.

On appeal, the Second Circuit reversed the district court's issuance of a preliminary

injunction and soundly repudiated the district court's election to apply an "undue burden"

---

[4]  The Second Circuit had stated in *Velazquez II* that "[a]ny grantee capable of
demonstrating that the 1996 restrictions in fact unduly burden its capacity to engage in protected
First Amendment activity remains free to bring an as-applied challenge."  *Velazquez II,* 164 F.3d
at 767.

balancing test.  *See Brooklyn Legal Servs. Corp. B v. Legal Servs. Corp.* [("*Velazquez V*")]*,* 462

F.3d 219, 228 (2nd Cir. 2006).  The *Velaquez V* court noted preliminarily that:

> Facial and as-applied challenges differ in *the extent to which* the invalidity of a
> statute need be demonstrated (facial, in all applications; as-applied, in a personal
> application).  Invariant, however, is the *substantive rule of law* to be used.  In
> other words, *how* one must demonstrate the statute's invalidity remains the same
> for both types of challenges, namely, by showing that a specific rule of law,
> usually a constitutional rule of law, invalidates the statute, whether in a personal
> application or to all.

*Velazquez V*, 462 F.3d at 228 (emphasis original).  The *Velazquez V* court then reiterated and

reaffirmed the standard it set forth in *Velazquez II*, namely, that "Congress may burden the First

Amendment rights of recipients of government benefits if the recipients are left with adequate

alternative channels for protected expression."  *Velazquez V*, 462 F.3d at 231, *quoting Velazquez*

*II*, 164 F.3d at 766.  The court remanded for further proceedings to determine whether the

plaintiffs were effectively precluded from establishing unrestricted affiliates.  *Id.* at 233.  The

court affirmed the district court's decision as to the facial challenges.  *Id.* at 236.

## VI.    Facts Underlying the Dispute Before the Court

LSC requires each state to engage in a planning process pursuant to State Planning

Configuration Standards promulgated in November 2001.  The planning process brings together

the state justice community "stake holders" to determine whether increased efficiency could be

obtained through the merger of more than one LSC grantee organization or through other

possible reconfigurations.

OLC, which also provides legal services in various parts of Oregon, does not receive any

funding from LSC and engages in legal work that LSC-funded programs are restricted from

undertaking.  LASO and OLC have wholly overlapping boards of directors.  However, LASO

and OLC do not at this time share any employees, office space or equipment.  Each entity pays

its own administrative and staff costs.  OLC estimates that the additional cost of this separation is $300,000 per year.

In May 2005 – following the decision of the district court for the Eastern District of New York in *Velazquez IV*, but before the Second Circuit's decision in *Velazquez V* – LASO submitted a proposal to LSC regarding the configuration of the programs delivering legal services to low-income Oregonians.  LASO's configuration proposal provided for the creation of a new nonprofit entity that would combine LASO and OLC under one corporation with a new name.  LASO and OLC would be registered with the Corporation Division of the State of Oregon under assumed business names to identify two divisions and to indicate that the two divisions had separate financial status.  LASO and OLC would continue to share one board of directors, but would also share one Executive Director.  LASO would continue to use LSC accounting and time record procedures to ensure that OLC activities would not be subsidized by LSC.

LASO's proposal included a plan to notify the public, including clients, the court, and government officials that it was separate from OLC.  This notification plan included use of displays with the different names, distinct letterhead, cards, and signs.  LASO also proposed to send letters to the courts and agencies explaining the separate funding and to communicate the same message to the media.  In addition to the executive director, LASO indicated it might share some employees with OLC and would ensure no crossover of activities by allocating the cost of shared personnel in accordance with LSC procedures and by keeping time records in accordance with LSC rules.  LASO also proposed sharing some equipment, client intake, and physical premises.  Again, in each instance, costs would be allocated  between LASO and OLC.

On July 15, 2005, the LSC Office of Legal Affairs issued an opinion stating that the LASO proposal did not meet the program integrity requirements of legal separation and physical and financial separation as required by the Program Integrity Rule. This action followed.

## ANALYSIS

I. **LASO Plaintiffs' Motion to Strike**

The LASO plaintiffs move to strike portions of the declaration of Mark Freedman (#112), filed in support of LSC's motion for partial summary judgment. Specifically, the LASO plaintiffs move to strike paragraphs 6 and 11 of the Freedman Declaration, which provide as follows:

> 6.  I am familiar with the allegations of Plaintiffs Legal Aid Society of Oregon ("LASO") and Oregon law Center ("OLC") in this litigation, and the deposition testimony of their respective executive directors, to the effect that LASO and OLC currently do not share any attorneys, non-attorney employees, or client intake systems. I am familiar with the LASO May 2005 proposal, which is the basis for my understanding of the current relationship between LASO and OLC. Based on my understanding of their current relationship, and in light of the arrangements that LSC has approved or permitted pertaining to other grantees . . . , **the PIR, as interpreted and applied by LSC, would permit a greater sharing of facilities than is currently undertaken by LASO and OLC**. The exact form of such permissible sharing would depend on how it was implemented.
>
> * * *
>
> 11.  Based on my understanding of the relationship between LASO and OLC, **the PIR would permit a limited number of individual LASO attorneys to work part-time for OLC**, provided the organizations otherwise complied with the PIR in terms of legal, physical, and financial separation overall.

Freedman Decl., ¶¶ 6, 11 (emphasis supplied). It is the LASO plaintiffs' contention that these paragraphs, and in particular the bolded portions thereof, are "flatly contradicted" by Mr. Freedman's sworn deposition testimony. In addition, the LASO plaintiffs argue that the paragraphs lack adequate foundation and are "unhelpful" to the court.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F. 2d 262, 266 (9th Cir. 1991) (citations omitted). This rule does not, however, apply in "every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony." *Id.* at 267. Instead, the "sham affidavit" rule is applicable only to "'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Id.* Such contradictory testimony can therefore only be excluded on the basis of a "factual determination that the contradiction was actually a 'sham.'" *Id.*

Here, the LASO plaintiffs assert that the portions of the Freedman Declaration cited above are irreconcilable with Freedman's prior deposition testimony that LSC lacked information as to how LASO and OLC allocated their collective resources and as to whether LASO was at that time in compliance with the Program Integrity Rule, had performed no analysis as to how LASO and OLC (or any other grantee) "should" allocate their resources, and had no position as to how grantee resources "should" be allocated.

While it appears that Mr. Freedman – LSC's designee for Rule 30(b)(6) deposition – was less well prepared for his deposition than he would have been under ideal circumstances, and therefore could give no definitive response as to the two plaintiff organizations' current compliance with the Program Integrity Rule, such ill-preparedness is not a basis for granting the motion to strike. Indeed, had the LASO plaintiffs feared that Mr. Freedman's lack of preparation had the potential to prejudice plaintiffs' ability to prepare their case, production of an adequate 30(b)(6) designee both could and should have been compelled before the close of discovery in this action.

Beyond Mr. Freedman's inability to answer questions regarding current compliance, comparison of the relevant portions of his deposition testimony and the complained of paragraphs of his declaration reveals no contradiction. Mr. Freedman's statements that LSC had not analyzed and had no position as to how the plaintiff organizations "should" allocate their resources is entirely consistent with having undertaken analysis and expressing a position as to how their resources "could" be allocated. Both sets of statements could simultaneously be true.

As to the claim that the complained of paragraphs of the Freedman Declaration lack foundation, the LASO plaintiffs' arguments are without merit. In his declaration, Mr. Freedman carefully stated both the basis and the extent of his personal knowledge of the facts he declared to. The declaration testimony is rationally based on the declarant's personal knowledge, and admissible as evidence. *See* Fed. R. Evid. 701.

For all of the foregoing reasons, the motion to strike is denied.

## II.    Dispositive Motions

On July 10, 2006, this court issued Findings and Recommendations recommending, *inter alia*, that defendants' motions to dismiss be granted as to plaintiffs' facial challenges to the constitutionality of the Lobbying, Class Action, Attorney Fee, and Solicitation Restrictions (collectively, the "Challenged Restrictions") and Program Integrity Rule, but denied as to plaintiffs' as-applied challenges based on plaintiffs' oral request for additional discovery in connection with the latter claims. On October 20, 2006, Judge Jones adopted this court's Findings and Recommendations in their entirety.

The legal questions that remain are quite limited in scope. The Challenged Restrictions have each been determined to be viewpoint-neutral, so the issue of viewpoint restriction does not

arise.  Because the Challenged Restrictions and the Program Integrity Rule are facially

constitutional, the sole issue is whether they have been applied to the plaintiffs now before the

court in a manner that impermissibly impairs their protected constitutional rights.

In analyzing that issue, this court agrees with the *Velazquez V* court that the "undue

burden" analysis employed by the district court in *Velazquez IV* is without support in applicable

case law.  Under the Supreme Court's unconstitutional conditions jurisprudence, administrative

burdens placed on alternate channels for the expression of protected speech are only material to

the extent they impact the effective availability – the adequacy – of those channels.

Perhaps more critical to the analysis is the effect on this litigation, if any, of the Supreme

Court's decision in *Velazquez III*.  *Velazquez III* raises at least two potentially material novel

issues:  whether the court's discussion of distortion of the legal system was intended as a

cognizable test of constitutionality, and whether the court intended to distinguish *Rust* as

inapplicable to the 1996 Restrictions generally, or only specifically to the welfare restriction.

As to the first issue, the *Velazquez III* majority made no suggestion that in discussing the

welfare restriction's potential "distortion" of the legal system it was creating a new test for

assaying the constitutionality of litigation-related speech.  Rather, it appears that the majority

intended its discussion of distortion as a means of highlighting the extent to which the restriction

could be expected to impair the First Amendment rights of LSC grantees.  In the absence of any

express characterization of the distortion analysis as a test of constitutionality, this court will not

apply it as such.

As to the second issue, the *Velazquez III* majority likewise omitted to suggest that in

distinguishing *Rust* it intended to overturn those decisions of the *LASH* and *Velazquez* litigation

sequences that expressly found *Rust* controlling. It therefore appears that the *Velazquez III* court found that *Rosenberger* rather than *Rust* controlled as to the welfare restriction only. Support may be found for this conclusion in the fact that none of the 1996 restrictions other than the welfare restriction operated to prevent LSC grantee attorneys from advancing arguments going to the merits of their clients' claims that would have been available to non-grantee attorneys. This court will therefore assume that *LASH III* remains the law of this circuit, and in consequence that *Rust* states the legal principles that govern this dispute.

### A.     LASO Plaintiffs' Motion for Partial Summary Judgment

The LASO plaintiffs argue that they are entitled to summary judgment as a matter of law as to the unconstitutionality of the Challenged Restrictions and Program Integrity Rule (including the guidance promulgated thereunder) as applied to attorney employees of LASO only. The main thrust of the argument is that, while LASO *qua* organization may have available to it an alternate channel for expressing restricted speech as required by *Rust*, the individual lawyers employed full-time by LASO have no such alternate channel of communication available to them. The primary issue raised by the LASO plaintiffs' motion for partial summary judgment is therefore whether the free speech rights of the individual LASO attorneys have been impaired by the manner in which LSC has enforced the Challenged Restrictions and/or Program Integrity Rule against them and/or against LASO.

As stated by the *Velazquez V* court:

> Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application). Invariant, however, is the *substantive rule of law* to be used. In other words, *how* one must demonstrate the statute's invalidity remains the same for both types of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal

application or to all.

*Velazquez V.*, 462 F.3d at 228 (emphasis original).

As noted in this court's Findings and Recommendations of July 10, 2006, this court only narrowly determined that plaintiffs' claims were fit for judicial decision, and therefore ripe for adjudication, basing its decision strictly on the potential chilling effect of LSC's denial of the May 2005 configuration proposal on plaintiffs' first amendment rights rather than on any showing of actual impairment. Now, following extensive discovery in connection with plaintiffs' as-applied challenges, the operative facts of this dispute are largely as they were when the court first entertained oral argument on February 23, 2006. That is, since the Program Integrity Rule was first adopted in 1997, LASO has submitted only one proposal for reconfiguring its relationship with OLC, its unrestricted, non-grantee affiliate: the May 2005 configuration proposal. Rejecting the May 2005 configuration proposal is thus the single action the LSC has taken to enforce the Challenged Restrictions and/or Program Integrity Rule against any of the LASO plaintiffs.

These facts do not create ideal conditions for bringing an as-applied challenge. Perhaps the most salient point mitigating against the LASO plaintiffs' position is that the May 2005 configuration proposal is facially noncompliant with the Program Integrity Rule. Specifically, the PIR provides that a grantee organization must be "a legally separate entity" from any unrestricted, non-grantee affiliate, 45 C.F.R. 1610.8(a)(1), whereas under the proposed reconfiguration the unrestricted "entity" would have been a separate division of the same corporate entity that received LSC funds. Moreover, the PIR specifies that strict physical and financial separation must be maintained between grantee organizations and unrestricted

affiliates, expressly providing that "[m]ere bookkeeping separation of LSC funds from other funds is not sufficient," 45 C.F.R. 1610.8(a)(3), whereas under the proposed reconfiguration LSC funds would have been kept separate from other funds almost solely by virtue of bookkeeping, and the physical premises of the two corporate divisions would have overlapped significantly. A first-pass analysis of the LASO plaintiffs' as-applied challenge therefore suggests that its underlying facts will be difficult to distinguish from those supporting plaintiffs' facial challenge, which has already been decided in LSC's favor.

The LASO plaintiffs have, however, entered evidence into the record which they assert serves to demonstrate that at least some LASO lawyers have been prevented from engaging in the exercise of free speech available to other attorneys. The evidence relating directly to the experience of LASO attorneys can be summarized as follows:

- Trena Klohe, a staff attorney in LASO's Hillsboro office, reports that in a case in which she represented an indigent client the judge *sua sponte* attempted to use the threat of attorney fee sanctions as leverage against a recalcitrant opposing party, only to be informed that Klohe's client could neither request such a sanction nor accept any award of attorney fees by operation of the Attorney Fee Restriction;

- Ron Rubino, a staff attorney in LASO's Oregon City office, reports that he was prevented by the Lobbying Restriction from lobbying the West Linn City Council regarding a proposed ordinance to limit closures of manufactured home, which arguably contributed to the failure of the ordinance proposal and the consequent eviction of Rubino's client from one such park; Rubino was similarly prevented from lobbying against an anti-camping ordinance passed in Clackamas County;

Rubino further reports that he is disadvantaged by the Attorney Fee Restriction in terms of negotiation leverage when representing tenants in landlord-tenant disputes, in which prevailing tenants generally have a statutory right to attorney fees;

- Plaintiff Janice Morgan, director of LASO's Farmworker Program, reports that the Attorney Fee Restriction disadvantages her in terms of negotiation leverage in farmworker disputes, in which prevailing workers generally have a statutory right to attorney fees;

- Ellen Johnson, a staff attorney in LASO's Hillsboro office, reports that many of her clients' housing issues involving land use regulations or zoning would be most effectively addressed through lobbying, from which she is prohibited by the Lobbying Restriction; Johnson further reports that the Attorney Fee Restriction disadvantages her in terms of negotiation leverage in landlord-tenant disputes, in which prevailing tenants generally have a statutory right to attorney fees; Johnson also reports that she is unable to represent clients who have been harmed by mold in rental housing, due to both the Class Action Restriction and the Attorney Fee Restriction;

- Plaintiff Arron Guevara, regional director of LASO's Pendleton office, reports that the Lobbying Restriction prevents him from lobbying on behalf of his low-income clients in connection with "local legislative efforts that could affect legal rights of low income people in [his] region;" Guevara further reports that he is disadvantaged by the Attorney Fee Restriction in terms of negotiation leverage

when representing tenants in landlord-tenant disputes, in which prevailing tenants

generally have a statutory right to attorney fees;

- Linda Gast, regional director of LASO's Newport office, reports a case in which

the Lobbying Restriction and Class Action Restriction prevented her from

adequately representing the interests of a low-income disabled client under threat

of removal from an assisted living facility when the facility's Medicaid contract

was terminated; and

- Plaintiff Sharon Schwartz, an attorney for LASO in its Roseburg office, reports

that the Attorney Fee Restriction disadvantages her in terms of negotiation

leverage in landlord-tenant disputes, in which prevailing tenants have a statutory

right to attorney fees; Schwartz further reports that the Lobbying Restriction

prevents her from representing the best interests of her clients who stand to be

adversely impacted by budget reductions currently being considered in Douglas

County in response to the loss of certain timber-related revenues.

The testimony of the LASO attorneys goes not to the existence or adequacy of alternate

channels of communication, but rather to alleged "distortion" of the legal system and

interference with the attorney-client relationship. Under *Rust*, however, this dispute will not be

adjudicated on the basis of fairness, efficiency, or good business judgment, but rather on the

availability of an adequate alternative channel for expressing the otherwise restricted speech.

The LASO plaintiffs also offer selected data points from the experience of other, third-

party LSC grantee institutions, suggesting that the Program Integrity Rule may have been

applied unconstitutionally to other legal services organizations not currently before the court.

This court disregards all such evidence – the accuracy and relevance of which the defendant and intervenor both dispute – on the ground that plaintiffs herein cannot prevail on an as-applied constitutional challenge to the extent grounded on constitutional injury to others. *See*, *e.g.*, *United States v. Dang*, 488 F.3d 1135, 1142 (9th Cir. 2007) ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court") (internal modifications and quotation marks omitted), *quoting United States v. Cheely*, 36 F.3d 1439, 1443-44 n.10 (9th Cir. 1994), *quoting Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

Finally, the LASO plaintiffs argue that they may rely on LSC's own published guidance which suggests that, in enforcing the Program Integrity Rule, LSC limits the numbers of grantee attorneys that can work part-time for grantee organizations and part-time for unrestricted affiliate organizations. That is, given regulations that restrict full-time grantee attorneys from engaging in the outside practice of law,[5] and given LSC's guidance suggesting that at most a proportion on the order of 10% of grantee attorney employees will be permitted to work part-time for unrestricted organizations, an alternative channel for exercise of the burdened free speech rights is strictly foreclosed as to a proportion on the order of 90% of LASO attorneys.

The argument is colorable that, in practice, LSC unconstitutionally enforces the "separate personnel" provision of the PIR to suppress at least some privately-funded speech that the government may consider potentially dangerous. However, as affirmed by the Ninth Circuit in

---

[5] Except under narrowly defined circumstances, full-time attorney employees of LSC grantee organizations are entirely prohibited from the practice of law outside the scope of their full-time employment. *See* 45 C.F.R. § 1604.4.

*LASH III*, "[i]nvalidating any rule on the basis of its hypothetical application to situations not before the Court is 'strong medicine' to be applied 'sparingly and only as a last resort.'" *LASH III*, 145 F.3d at 1027, *quoting FCC v. Pacifica Foundation*, 438 U.S. 726, 743 (1978). Here, the LASO plaintiffs have failed to identify with precision a single lawyer who has attempted to avail himself or herself of the opportunity to speak as an OLC attorney and been prevented from doing so by LSC enforcement of the PIR. Because the only evidence that the LASO attorneys' free speech rights have been in any way impaired is, at best, speculative or hypothetical,[6] the LASO plaintiffs cannot prevail in their as-applied challenge.

The LASO plaintiffs' motion for partial summary judgment is therefore denied.

**B.      Defendant's and Intervenor's Motions for Summary Judgment**

LSC and the United States move for summary judgment as to all plaintiffs' as-applied challenges. As noted above, under *Rust*, the Challenged Restrictions to plaintiffs' speech rights must be deemed constitutional if, as applied in connection with the program Integrity Rule and implementing regulations, adequate alternate channels are available for expression of the burdened speech.

This court agrees with LSC and the United States that LASO and OLC's decade-long history of working together as affiliate organizations demonstrate that, as organizations, LASO and OLC have not been effectively precluded from engaging in protected speech. Evidence of

_____

[6] This is not a circumstance in which the court would be justified in applying "strong medicine . . . of last resort" by issuing a constitutional ruling based on a purely hypothetical potential impairment in the context of an as-applied challenge. Nothing prevents LASO from submitting a second configuration proposal which identifies by name particular LASO attorneys who, under the proposed configuration, would split their time between LASO and OLC. In the event the proposal was unconstitutionally denied, LASO and its attorneys could bring a new as-applied challenge, supported by a well developed record of non-speculative evidence that the free speech rights of particular attorneys were being impaired.

inefficiencies arguably created by the two-organization structure fails to establish that the alternate channel is "unavailable." Because *qua* organization LASO has a means of engaging in the restricted speech, defendant's and intervenor's motions for summary judgment should be granted as to LSC and OLC. Similarly, because they can point to no actionable impairment of their constitutional rights occasioned by LSC's enforcement of the Challenged Restrictions, the motions should also be granted as to the OLC employees and as to Plaintiff Sather.

As discussed above, on the evidentiary record before the court, the LASO plaintiffs cannot prevail as a matter of law on their as-applied challenges on behalf of LASO's attorney employees. Defendant's and intervenor's motions for summary judgment should therefore be granted as to the LSC employees.

The Supreme Court's decision in *Rust* clearly forecloses the constitutional challenges brought by CAT, which argues that its members' rights as clients of LASO are impaired by the Challenged Restrictions:

> Congress' refusal to fund abortion counseling and advocacy leaves a [Title X grantee client] with the same choices as if the Government had chosen not to fund family-planning services at all. The difficulty that [such a client] encounters when a Title X project does not provide abortion counseling or referral leaves her in no different position than she would have been if the Government had not enacted Title X.

*Rust*, 500 U.S. at 202. Because the client plaintiffs cannot show that they have suffered cognizable constitutional harm, defendant's and intervenor's motions for summary judgment should be granted as to CAT.

Finally, CEJ, the donor plaintiff, which argues that its rights are impaired when it is required to choose between donating to LSC and donating to OLC, has likewise suffered no cognizable constitutional injury. Indeed, in its Findings and Recommendation of July 10, 2006,

this court specified that in order to proceed further, CEJ would be required to demonstrate some cognizable degree of unattenuated injury to its own interests, and CEJ has not attempted to make any such showing. Because CEJ has no constitutional right to make donations to an unrestricted legal services corporation, defendant's and intervenor's motions for summary judgment should be granted as to CEJ.

## CONCLUSION

For the reasons set forth above, the United States' motion for summary judgment (#106) and LSC's motion for summary judgment (#109) are granted, and the LASO plaintiffs' motion for partial summary judgment (#115) and motion to strike (#147) are denied. A judgment will be prepared accordingly.


Dated this 7th day of April, 2008.


  /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge